Good morning, and may it please the Court, Micah Moore for the Attorney General. With the Court's permission, I'd like to reserve three minutes for rebuttal. Please watch the clock. The challenge laws require California residents to pass a background check before they can acquire ammunition, just like they must to acquire firearms. Those background checks allow the State to confirm that those who receive ammunition can lawfully possess it. Plaintiffs in this case don't challenge the premise that governments can disqualify certain individuals from possessing ammunition. Their core theory is instead that the background check requirement violates the Second Amendment on its face. That theory fails. Counsel, I want to interrupt you here. I just want some clarification. Is it clear that this is a facial challenge? Yes. I think plaintiffs can speak for themselves, but they've confirmed in their answering brief that this is a facial challenge to the background check requirements. I saw that in the prayer for relief that they said that it was a facial challenge and alternatively an as-applied challenge, but I didn't see anything in any of the pleadings that suggested that there was anything particular to these plaintiffs. I think that's correct, Judge Bivey. There's nothing in the complaint that suggests that this challenge is limited to the facts, and of course— Did the District Court acknowledge that this was a facial challenge? Yes. Well, the District Court enjoined the statutes in their entirety, and I don't think there's anything in the District Court's order that suggests that under—that the injunction only runs as to particular plaintiffs or facts. But why are we considering all of the statistics if this is an on-its-face challenge? I think because if it's a facial challenge, the plaintiff's burden would be to show that the statute is unconstitutional in—there's no set of circumstances under which the ammunition— But in that case, why do we even bother with looking at, for example, the wait times or the denial rates or the rejection rates? I think because the Supreme Court has suggested in Bruin that if you have a background check requirement that's being applied in an abusive manner, and I think if there were features of the scheme that run from the statutes that are causing it to be applied in that way, then that would be a— But wouldn't that be an as-applied? If California said you have to pass the test, and the test were being—was taking, you know, 60 days, then we might say it's abusive. And if the regulation said 60 days, that might not be an on-its-face. That might be an as-applied challenge, wouldn't it? Or if there turned out to be unusual wait times in application, that feels like that would be an as-applied challenge. I certainly agree that there's aspects of plaintiff's challenge that sound as if they were—be more properly brought as an as-applied challenge, but I understand—and they can correct me if I'm wrong—their argument to be is that there's an inherent risk any time anyone submits to a background check that they're going to experience one of these issues or run into long wait times, and the fees themselves are prescribed by regulation. In an on-its-face challenge, are we looking to see whether any person in California might be subject to an abusive time or an excessive wait time, or are we looking for something else? I think in a facial challenge, they would have to show that there's no set of circumstances in which the statute can be applied in a constitutional way. I do think that the record suggests that their facial challenge fails, because what the record shows is that in the overwhelming majority of instances, people are able to get the background check completed in less than a minute. And so I don't think that's the kind of—I think this discussion is revealing that their facial challenge might fail on the merits, but that wouldn't speak to any future as-applied claim that someone might bring if they do run into a different situation. Thank you. And so, you know, I think this is a challenge that Bruin has provided some recent and compelling guidance on. Bruin suggested that shall-issue licensing requirements don't violate the First—the Second Amendment unless if they are applied in an abusive manner. The Supreme Court just gave two examples. One example could be if the background check requirements require exorbitant fees. The other could be if they require lengthy wait times that are so long that they amount to a denial of Second Amendment rights. The record does not— What difference does it make that in order to get—to have an operational gun, basically, because you need ammunition to be operational, you have to do it every time you want ammunition, as opposed to maybe a year you have to renew it or the like? I think that's something—that's certainly something that the Court can take into account in evaluating whether the background check requirements are abusive, but I don't think that that fact alone can change the result here where the record reflects that even if you are submitting to the background check multiple times to purchase ammunition, in each instance you do so, it's most likely going to take less than a minute to complete. And so I don't—I just don't think that that fact alone can change what the record shows. Something else that I also think is meaningful is that— Are you—when you say less than a minute, are you referring—because apparently there's various different types of background checks, and some of them says it takes five to six days, et cetera. Which one are you actually referring to? So I'm referring to all background checks, but the majority of background checks that people request are standard checks, which are subject to an expedited process. So there you have to be in the Federal Automated Firearms System. Yes. And how long does that take, or what is that process? So most firearms are in the Automated Firearms System because the state has required registration for handguns since the 1990s and for long guns for the last decade. There may be issues that can arise if your AFS registration is not up to date, and so that's something that could happen if you change addresses. But for those individuals, the department provides a self-service website where firearm owners can initiate the process of updating their records. What if you don't own a firearm? What if there's no record of you owning a firearm? So either you've acquired it in some other way or you have access to someone else's firearm who is in the system, but you're not already in the system. Then what happens? So if you own a firearm that's not in AFS, you can submit a firearm ownership report to the department to become— What if you just go in and you just say, look, I want to buy ammunition, and you're not already in the system because you have not indicated to California that you've purchased a firearm? Okay, so if you don't have a record, then you have the option of requesting and passing a basic check, which doesn't require enrollment in the Automated Firearms System. So if you haven't already indicated to California that you own a firearm, you have to go through the basic check? Well, you don't have to indicate to California to end up in AFS. It also pulls from firearms vendors' records, and so it's more, have you purchased a firearm in the last years in California? Then you should be in the system. But if California can't verify that you own a firearm, can you still buy ammunition? You can still buy ammunition, yes. You just have to request and pass the basic check.  So has any court held that footnote 9 of Bruin applies to the purchases of ammunition? I don't think we have a case applying footnote 9 in the context of ammunition. There are certainly decisions that have thought about footnote 9 in the context of firearms backgrounds checks, and so I think the McCrory— I mean, there's a serious distinction between a firearm and ammunition in that a firearm is somewhat durable. You would assume you'd own it for quite some time. Ammunition is expendable. It will be, you'd be purchasing ammunition repeatedly. So footnote 9 is talking about a licensing process as opposed to permitting. So it seems that you're asking us to, without authority, stretch what footnote 9 means to say that you have to find that this was an abusive scheme before it was unconstitutional. I definitely take the point that Bruin was decided in the context of firearms, but I do think the guidance that it offered is also relevant to ammunition. What the court suggested is that the focus should be on whether or not the requirements are abusive and that they're, whether or not they're requiring undue wait times or exorbitant fees, and I think that's analysis that can be applied to ammunition as well. And the fact, I definitely take the point that ammunition is different than firearms, but I do think these background checks are different than firearms background checks in a way that supports our position as to whether or not they're abusive. They require— I'm sorry. Sure. I was just going to say they require shorter wait times. They cost less than a firearms background check. There's no waiting period that applies to ammunition transactions in the same way as firearms transactions, and so in most instances, you can leave the store with ammunition rather than having to wait 10 days as under the firearms regime. So I understood your brief to argue that the purpose of this is to prevent prohibited possessors from having operable firearms, but isn't that accomplished by the background checks and the schemes to control the purchase of the firearm? So a prohibited possessor is going to come in and just buy ammunition? It seems like it's a bit of a stretch that this is going to somehow increase your effectiveness in policing prohibited possessors. Well, I think the reality is that the firearms background check doesn't serve a purpose where someone's able to obtain a firearm through other means. And so the Jones Declaration, for example, that we cited speaks to this. That declaration described law enforcement investigations that started off from a denied ammunition purchase. And in several instances, the law enforcement was able to recover firearms that had been obtained illegally. And so I think that's the additional enforcement benefit that the ammunition background checks are providing, even if there's a separate firearms background check requirement. I'd like you to turn to what test we are going to be applying. Are you familiar with our decision this year in B&L? Yes. Okay. So how does this fit into B&L's analysis as to whether a restriction on commercial sale of ammunition is within the plain text of the Second Amendment? So do we even get to the historical analysis? I think this is a case where the court could not get to the historical analysis. B&L suggests that the relevant test is whether or not the regulation meaningfully constrains the right to keep and bear arms. Even separate from B&L, that test was established in Teixeira. And so I think applying that analysis here, plaintiffs just haven't shown on a facial basis that these background check requirements are preventing individuals from being able to keep and bear operable firearms for self-defense. How is it operable if you can't get ammunition? Well, I think our argument is that you can get ammunition. It's just that you have to pass the background check requirement in order to do so. But the point is that it's an infringement on that right. So you can't operate a firearm without ammunition. And I think Jackson is our case that says that it's part and parcel of the Second Amendment right to keep and bear arms. It's meaningless unless you can have ammunition to go with it. And B&L and Teixeira were addressing the acquisition of firearms. I think B&L was really more—it was purchasing firearms at trade shows or something along those lines, and you could acquire a firearm like 600 feet away. So there really was no meaningful infringement on your right to acquire a firearm, which seems very different from a scheme that requires you to get permission to purchase ammunition every 18 hours. I mean, these expire so quickly. That strikes me as very burdensome. Well, I guess a couple of different points. I think first, starting with Jackson, this Court has recognized that ammunition is entitled to Second Amendment protection, and we aren't contesting that at all. But what, of course, is said is that ammunition is protected under an ancillary protection, and that protection is not itself absolute. It's only to the extent that it's necessary to realize the right to possess a firearm for self-defense. So do you think this nuance of describing a right as ancillary survives Bruin? I think it does. I think this Court is bound by B&L. And in B&L, the Court held that Teixeira's text and history analysis is consistent with Bruin. And so I do think this Court's prior precedent on ancillary rights and when they implicate the textual right of the Second Amendment does apply here. It's pretty hard to say that ammunition doesn't, because a gun without ammunition is not usable. So it's not ancillary. It's intrinsic to having a firearm. I think that's not quite what this Court has said. But I also don't think it's a principle that we deny that you need to possess ammunition in order to have an operable firearm. Our position is just that plaintiffs haven't shown that the background check requirement is meaningfully constraining their right to possess firearms for self-defense. So if there are no further questions, I'll reserve the balance of my time for rebuttal. All right. Thank you. Good morning, Your Honors. May it please the Court. Matthew Rowan on behalf of the plaintiffs. The District Court described California's ammunition background check and anti-importation regime as an extensive and ungainly, first of its kind, sweeping statewide restriction on a phenomenon of right that is unprecedented in American history. That description is not only correct, it undersells things. Not once in the first 240 years of this country's history did any state see fit to require law-abiding individuals to submit to a state investigation each and every time they seek merely to acquire the ammunition without which their firearms are inoperable. That's not because ammunition sales or background checks are some newfangled innovation. Ammunition sales predate the founding, and there is a tradition in this country of limited, minimally burdensome firearm background checks that dates at least back 100 years. Yet it took long after that for any state to even think of implementing such a regime, and California was the first to actually do so five years ago. Given that historical reality, the idea that California, that any ammunition background check regime could pass muster under Bruin-Rahimi strains credulity, but this court doesn't even need to decide that question to affirm the district court's decision, because California's one-of-a-kind regime is in a league of its own. And so I want to start just by going through the Second Amendment analysis and explaining why. Before you do that, would you address the question of on its face versus applied? Sure. Is this an on-its-face challenge? This is a facial challenge, and I think the right way to think about facial challenges are nicely described in this court's en banc opinion in Lopez-Valenzuela, where you were in the majority in that case from 2014. And what Lopez-Valenzuela says is you look at the relevant constitutional decision rule. That's the phrase that was used there. There, somewhat confusingly, the relevant constitutional decision rule was Salerno's due process standard, separate from Salerno's facial challenge dictum. And what the court said there was, yeah, even though one of the actual plaintiffs in that case could have been constitutionally detained, that was Arizona's Prop 100 laws that basically deprived any person who wasn't here lawfully present from the ability to get bail, even though one of the actual plaintiffs could be constitutionally held without bail under a different statute. That didn't render the statute not facially unconstitutional, because what you do is you don't look at sort of individual circumstances. You look at the relevant constitutional decision rule. So what is your burden in this case? Sure. So we think that we have a threshold burden under Bruin, and we think that the threshold burden is very easy for us to satisfy here, given that this is a complete gatekeeping on the ability to acquire ammunition. So your position, you're going to take the strong position, which is that there can be no background checks for ammunition. Is that your position? We do take that position. And we think, one, I mean, clearly it implicates the Second Amendment to have a regime. Before you get to that, because I want to address BNL here in terms of framework. So the question of sort of the wait times here is largely irrelevant. Your position is that any delay, even de minimis delay of, let's say, 60 seconds, even if we had 100 percent of background checks being completed in less than 60 seconds, that would still violate the Second Amendment. So that is our position with respect to ammunition background checks. And I'm happy to sort of talk about that. But the reason why, even if you don't agree with us on that, the reason why the facts matter is the relevant constitutional decision rule here is Bruin and Rahimi's how and why test. And how, you have to look at not only what the statute says, but how it actually operates. And part of how this statute or many statutes operate is dependent on the fact that rather than set up a database that actually works, which is how Prop 63 initially was going to do, the sort of initial version that the voters of California approved, required California to set up a centralized searchable database where your number would be your same as your driver's license number and vendors would have access to it. And just like the Brady Act, they didn't just, you know, Congress didn't just say, Nick starts overnight. They gave the FBI five years and a bunch of money to set up a system that works. Whereas here, that's what the voters voted for. But the California legislature pre-amended Prop 63 and they got rid of what would have been Section 30370C. And instead, they said, no, we're going to piggyback on the AFS system. But the problem with the AFS system is that it relies on dealer inputs. And it was never intended until this regime was put in place to be used as a gatekeeper to the exercise of anything else. So, I mean, we have evidence in the record where, you know, the dropdown menu when you go to buy, you buy a firearm and your dealer puts it into AFS. You have things that say Huntington Beach, B-E-A-C-H. OK, I have to say, I'm confused by all of this. I mean, everything that you're saying, I understand, makes a lot of sense. But it feels like it would make a lot more sense if you had an as-applied challenge. So I understand on the facial challenge, I think I got the right answer to the question, which is that you don't, that even if California successfully integrated this from the beginning, they've studied it for five years, worked all of this out and had 100 percent at 60 seconds or less that would still violate the Second Amendment. Isn't that your strong position? That is, that is our initial position.  And if you don't agree with us on that, still under the facial challenge rubric, the how facts actually matter because the relevant constitutional decision rule under Bruin and Rahimi looks at the how and the why. You have to compare historical analogs in terms of the burden that they impose on the exercise of the fundamental Second Amendment right to the burdens that the regime imposes. And the way we know, I mean, this is an unusual case, not only in that we have a record, but we have two different time periods of records because the case was back, you know, before the district court in 2019 and then again in 2023. And what we've seen is that thousands of Californians have been unable to acquire ammunition as a direct result of this regime. So I wanted to talk about BNL for a second. So we don't think that the BNL framework is... Do you have any plaintiffs who have standing? Yes. To challenge those delays? I didn't see anything in your complaint that suggested there was any individual person who had had a separate delay. So we have a robust record here. I would commend... Is there anything in your complaint that suggests that you've got a plaintiff? So the complaint was filed before the regime had gone into effect. Which indicates that it's an on its face challenge. Right. But now it's gone into effect. And we have declarations in the record that the district court relied on. So Plaintiff Johnson at ER 58, after he moved, he was unable to use the standard check. It took 110 days for California Department of Justice just to respond to him. We know that Kim Rohde, the lead plaintiff, has had to spend thousands of dollars storing ammunition. She's an Olympian and she can't get it to her house. This court's precedent, including cases like Montana Shooting Sports Association, makes clear that expending time and money to comply with a burden on the Second Amendment is sufficient for standing. We also have an associational plaintiff, CRPA. And we have two declarations from the treasurer and the president, respectively. Once we go to... Let's take Mr. Johnson because the 110 days is a disturbing figure. Once we go to that, doesn't that make this an as-applied challenge? So it doesn't, Your Honor. And I really think that facial and as-applied challenges, it's confusing. But I do think I would take a look back at the majority opinion in Lopez Valenzuela that explains that the facts often actually matter in as-applied challenges. So wait, I'm sort of confused about those steps and Bruins. Oh, so it's your burden to show that this is an arm that's... See, the Second Amendment protects, right? And it's the government's burden to show that there's a historical analog. Is that... Aren't I correct there? So where does the individual challenges come in? So you're correct. And that's definitely the analysis that Bruins sets forth. And we think that it's a very clean analysis here. And that, of course, a law that says you have to pass through a gate that the government controls in order to acquire ammunition. Of course, that law implicates the Second Amendment. So we think that, you know, B&O Productions, and to share cases like that, where it's you can't purchase firearms at two fairgrounds, but you can purchase it everywhere else. The difference between that law and a law like this is this applies always and forever to everyone. And it is an absolute gate that you have to go through that the state controls. So, of course, that implicates the Second Amendment. And I think Bruin footnote nine, like the only way to make sense of Bruin footnote nine is to understand that background check regimes and licensing regimes, which this, of course, isn't, implicate the Second Amendment. Otherwise, how could something ever violate the Second Amendment? The only logical way under Bruin and Rahimi's two-step framework for something to violate the Second Amendment is if you've passed the threshold inquiry. So we think that the sort of B&O Production substantial burden sort of standard is not the correct way to approach a law like this. But even if you disagreed or if you thought the better course of valor was to assume without deciding that you were in sort of the B&O Productions framework, of course, this statute imposes a substantial impairment on people's ability to acquire operational arms. The government argues that bullets are ancillary. That seems to go to the first step, whether this implicates right of the people to keep and bear arms. So what's your position on that? So, I mean, this court has said that they are ancillary. I think that the way that I would understand that with respect to ammunition is that they're ancillary in terms of being inherent. I mean, ammunition is itself an arm. So I don't think that, you know, the ancillary piece goes to ammunition. What this court has said is it goes to the acquisition. But of course, one cannot possess what one can't get. So I think it's a mistake to think of acquisition as ancillary just because the Second Amendment doesn't say explicitly purchase or acquire alongside keep and bear. I recognize that Manny and B&O Productions take a somewhat broader view. And so if the court wants to sort of say, look, we're going to assume without deciding that we've got to follow this substantial impairment test to get through the threshold, we think that's not the right way to sort of do this a priori under Bruin and Rahimi. But we think clearly it's past here because, again, we have a record. So do background checks for firearms, does that come within the Second Amendment? Of course. That comes within the plain text? Of course. I mean, I think otherwise... Okay. I understand that B&L doesn't cover that. But we do have three other circuits that this year have said that background checks do not come within the plain text of the Second Circuit. You're urging us to go into conflict with, by my count, the Fourth, Fifth, and Tenth Circuits. So what those courts have held is twofold. What they've held is, one, if you frame the question as the conduct plus the restriction. So if you frame the question as, do you have a right to acquire a firearm without passing through a background check? Well, that's not covered by the plain text. But they've also then said, but of course we can't say that background check and licensing regimes do not implicate the Second Amendment because that would overrule Bruin, which of course was a licensing regime case. And again, I think Bruin footnote nine would make no sense if you thought that background checks didn't implicate the Second Amendment. And I mean, again, perhaps the safest way to do this is to just say, fine, you know, we'll assume that B&L Productions is the correct standard for here. Pass through the threshold because, of course, a law that prevents thousands of law-abiding citizens from acquiring ammunition without which a firearm is inoperable, of course that imposes a substantial impairment on law-abiding citizens' ability to acquire arms. So even if it's a 60-second check. So I do think, I think even if it were a 60-second check with respect to ammunition, because as Judge Beatty pointed out, ammunition is expendable. In the record, when California first passed Senate Bill 1235, which pre-amended Prop 63, they did an economic assessment and they, one of the assumptions was that people will buy 40 rounds at a time. 40 rounds doesn't last very long if you're training, which is something that you want people to be able to do. So people are going to go buy ammunition all the time. Does California limit how much you can buy at one time? So California doesn't, but we know from the record that people aren't just sort of spending money willy-nilly. Although Ms. Rohde might buy it in bulk. So Ms. Rohde might, although Ms. Rohde may not have to pay for it herself because USA Shooting does provide her some of it. So yes, I mean, there are certainly special cases, but what we know from the record is that people aren't willing to spend the, you know, five times as much as a standard box of 22-round ammunition just to pay for the $19 basic check, which soon will be more expensive, as my friend on the other side pointed out in a footnote in their reply brief. So we do want to sort of shift to the historical tradition part of the analysis. Can I ask you a question before you go? Of course. So it seems like the real battle in these cases is how we define the proposed conduct. You know, if you define it as Bruin did, as, you know, the right to keep and bear arms, it falls clearly within the plain text as opposed to saying the right to have a license to concealed carry or to carry in public, whatever. So B&L described the conduct as contracting for the sale of firearms and ammunition on state property, which is not in the text of the Second Amendment, but it could have been defined differently. And are there any principles? It seems like the case law is a little bit all over the board. So any principles that we can apply to decide how to define the conduct at issue? So, I mean, I think that sort of when you're looking at smuggling in the restriction into deciding what the proposed conduct is, you jump the tracks a little bit. So, I mean, I think sort of a priori, I'd say the way that B&L or Manny sort of framed things is just wrong. I understand that this three-judge panel is bound by those decisions. So what I would say is two ways of distinguishing them, and one of just saying that even if those apply, we pass the standard here. So the two ways of distinguishing them is in cases like B&L and Teixeira, again, they're narrowly geographically limited, and you can go elsewhere and you are free to acquire arms 600 feet away. Whereas this is always and forever, everyone is at constant risk, and everyone has to go through this. Judge, maybe one point on the facial challenges. One of the problems with doing an as-applied challenge here is the sort of difficulties with actually getting the state to run the background check, which they declined to do upwards of 10% of the time, is that you don't know why they're not running it. So it would be very difficult for you to actually bring an individual as-applied challenge, because, of course, they would move your challenge. So, I mean, I think when you have a...  That is capable of repetition, yet evading review. But, I mean, it seems to me if you came here with Mr. Johnson and said, Mr. Johnson, Mr. Johnson's, you know, licensed gun owner has no impediments to ownership of, to acquisition of firearms or ammunition, and in the process moved, and it took California 110 days to get the problem solved. That's, that seems to me to be a pretty substantial burden. Well, we certainly have done that. I mean, he is a plaintiff in this case. Right, but that, but that's an as-applied, that's an as-applied challenge. And that's why I'm so confused. I was confused by the briefs. I was confused by the district court's opinion, because I didn't see the district court ever acknowledge that this was a facial challenge or ever cite any standards for what that meant. So, again, I would, you know, just go back and look at the Lopez Valenzuela opinion, which I think explains sort of how this works. And, and I do think, I mean, just quickly on the B&L point. I mean, I think, I think the way to think about this as different from those cases is that the state is controlling your access to something that is necessary to exercise the Second Amendment right at all. And it controls it always. You can't go out of state and bring it in because of the anti-importation regime. You have to go through this process, and for a large and arbitrary percentage of the people, they won't even do it. So if that doesn't implicate the Second Amendment, then it's hard for me to understand what would. Again, I think Bruin footnote 9 only makes sense if licensing regimes clearly are covered by the plain text. But, I mean, you know, I recognize that B&L Productions seems to state a very broad principle. And so, you know, if the court wants to just say, we're going to assume that substantial impairment is the right standard, then, of course, substantial impairment matters. I mean, I also think there's no way to do, Judge Bivey, a substantial impairment analysis on an individual basis, because otherwise you'd have a bunch of people challenging the statute all the time, which is why you sort of have to do this on a broad basis. And again, the how and the why are the standards at the historical tradition stage. And if we look at the state's proposed analogs, I mean, they're not remotely in the ballpark. Well, you could easily come up with a statute that would fail the substantial, the meaningful restraint, our language from Teixeira and B&L, on a state that California said, you're going to have to wait 60 days. And it was right in the statute. Okay. Doesn't matter how, 60 days, it's a waiting period. That's on its face. You win that one easily. So I think part of the problem with what California did is they didn't do step zero. They didn't create the database that is necessary for this to work for everyone. And so if they did it by driver's license, that would satisfy the Second Amendment? So we don't think it would. I thought your position was that any restraint would. So that's certainly our strong form position. But as Judge Benitez himself pointed out, if they'd gone with Prop 63, we'd have a much tougher case. We would have to win, assuming that it actually worked, but we'd have to win sort of the strong form argument. Because the way that worked is that was going to be a four-year license where you paid $50 once and it just used your driver's license number, and it would be instant. But instead of spending the time and money necessary to put in the database, that again is the gatekeeper to one's ability to acquire arms, period. They said, no, we're going to piggyback on this other thing that has never been used for this. And we know now that it doesn't work. And so just quickly on historical tradition. So I mean, the state's analogs, they try to rely on loyalty oaths, which you entirely control, and they're one and done. The idea that that's sort of similarly burdensome to a regime where you have to pass through the state's gate, and you can't force them to do it, and you have to do it each and every time you want to acquire ammunition. Counsel, your time is going to expire, and I'm going to ask the Chief to give me permission to, the presiding judge to ask permission to a different line. All of this is avoided if there's a problem under the domestic, I'm sorry, under the Dormant Commerce Clause. So would you just take a minute and explain to me your best argument under the Dormant Commerce Clause? Sure. So the state concedes that vendors need a physical presence and a license in California to sell ammunition to Californians. The only option for an out-of-state vendor to sell to a California resident is to funnel sales through a select few licensed in-state vendors. That's textbook facial discrimination, because what California has done is they've hoarded a local market for a favored group of local merchants. We also have real evidence of discriminatory effects. What California has done is said, you have to have a face-to-face transaction here. Actually worse than that. So I mean, so if you look at a case like Blackstar, which I think is their best case, which was the Arizona exception to the three-tier system. So that had a face-to-face requirement. And what it said was, you can sell, if you're out of state, you can sell two cases of wine in a face-to-face transaction to an Arizona resident. Here, you cannot do that. You have to ship it to an in-state vendor for processing. And we have evidence in the record that many in-state vendors that are licensed are either refusing to accept the processing or they're basically charging exorbitant fees. If you're a Colorado manufacturer of ammunition, obviously you can't ship it in over the internet. So you can't ship it directly to the house via Amazon, for example. But there's no restrictions on how much you can sell to a licensed vendor in California. I mean, Colorado-manufactured ammunition is being sold in California. Well, so I think the relevant distinction is not between... Am I right? Let me just make sure I'm right on that point. You're certainly right. Okay. The relevant distinction is not between Colorado manufacturers and California dealers. It's between California dealers and everyone else. And what California has done is it say, in order to have access to this market, you have to go through the select few licensed dealers. The only other regime in history that looks anything like this is the three-tier system in the alcohol context. How would this work, for example, on the sale of cigarettes or alcohol if you can't sell to minors? How would you do that outside of a face-to-face transaction? So alcohol, of course, has its own sort of constitutional allowance. And the way that works is you have to sell, basically, from out-of-state, from the states that have the three-tier system, you have to sell to an in-state wholesaler. And then they sell the retailers. So in many states... But how do you deal with a minor problem? Yeah, so... The three-tier system deals with a much broader problem. Right. So how do we deal with a minor's problem and cigarettes? So you can make it criminal to possess cigarettes if you're under 18. So that's step one. And if you want to have a face-to-face requirement, you can. You could require licensure. I mean, you know... Right, but wouldn't that... Doesn't that sort of limit it to in-state sales? So no, because, I mean, again, this is not just the face-to-face requirement. There's also Section 30314, which is the anti-importation regime, where you cannot bring it in with you, period, unless you have it sent to an in-state vendor. No state in the country does that for any product other than alcohol. Not for cigarettes, not for anything else. And the way that they do it is they say, it's a crime to sell to kids. So if the kid age verifies, well, that's a crime. And so they have criminal laws for both the seller and often the shippers and the children. And that's the regime that works for tobacco. And there is no other regime in the country's history, not now, not ever, that says you cannot bring a product in unless you funnel it through a favored select cabal of favored in-state vendors, which can then charge whatever price they want. I mean, the state points out, and I know I'm far over time, but the state points out very briefly that, oh, it's only a dollar fee for the in-state processing. That's only if you are there the moment the product arrives, which almost nobody is because it doesn't come with them. It has to come through a shipper. So unless you are there the second it arrives, they can charge whatever fee they want. And we have evidence in the record, the ABLES declaration and the Ammunition Depot declarations at ER 64 and 67, that they're charging exorbitant fees, which has had the effect of just completely decimating out-of-state vendors' sales to California residents. That's textbook discriminatory effects. Okay, thank you. Thank you for your additional comments. And you have some time left for rebuttal. So I wanted to just start with the Dormant Commerce Clause claim. I think what the Court's precedents show that requirements have been invalidated as discriminatory on their face when they impose requirements that are so associated with protectionism that they're virtually invalid per se. I don't think that that's what these statutes do. Anyone, regardless of where they're incorporated or where their workers are located or where they manufacture their ammunition can apply for a license to open up a vendor location in California. If not, they do have the option of having their transactions processed by in-state vendors. My friend on the other side suggested that the fee is just, it's limited. I just wanted to clarify what the requirement is. The fee is limited to $5 if the purchaser is immediately present. The fee that's charged for processing the requirement if the purchaser isn't present has to be agreed on with the purchaser ahead of time. Is there a storage fee that's not specified? Yeah, there's a storage fee, but it has to be agreed upon with the purchaser before the ammunition is sent to the vendor. And so the purchaser has the option of declining if it's, but I don't think there's any evidence in the record that suggests that in-state vendors have been imposing exorbitant fees. And then I wanted to quickly return to the Second Amendment claim. Plaintiffs have confirmed that they brought this case as a facial challenge, and Rahimi reiterated that Salerno is the standard that applies. I think what plaintiff's evidence shows at most is that there have been individual circumstances in which the background check requirements worked less than seamlessly. In many instances, I don't think those declarations show that the firearm owner was unable to obtain ammunition. And so to take one example, my friend on the other side mentioned the Donson Declaration in ER 558. That's certainly an instance where someone experienced a regrettable delay in updating their AFS records. But of course, that person also had the option of requesting and passing a basic check while they were waiting for their AFS records to be updated. And stepping back a bit, I don't think there are more than 20 declarations in the record that express some sort of complication with the ammunition background check system for a system that performed 600,000 background checks in the first six months of 2023. And so that's not the sort of evidence that suggests that plaintiffs can prevail on a facial challenge. As to the threshold inquiry, I do think BNL is binding because it did purport to establish a standard that applies to ancillary rights. Stepping back a bit, as Judge Bybee noted, there have been several circuits that have been confronting this question about what you do when you're evaluating a regulation that's one step removed from the plain text. And I think the McCrory and the Maryland Shell issue in the Oakland tactical cases show that other circuits are converging on analysis that may differ in its phrasing, but looks quite similar to the analysis in BNL, where you do have to inquire into whether or not there's a practical effect on the right to keep and bear arms. And then as a final point, I just wanted to say quickly on the history. You know, even if this court were to assume that this is a case that gets past Bruin's threshold step, the challenge background check requirements are supported by historical tradition. I think plaintiffs rely quite heavily on the fact that California's system is novel, but Rahimi and Bruin stressed that the Second Amendment was not intended to impose a regulatory straitjacket or foreclose states from adopting new methods for addressing problems, so long as those methods were consistent with historical tradition. So what's your best historical argument? I think we have several. I think the loyalty oaths and the founding... Now, when I read the declaration on the loyalty oaths, that was interesting. It was interesting history. I wasn't aware of all of the history of the various oaths that were issued during Reconstruction. What I had a hard time figuring out was the connection between the loyalty oaths and regulation of firearms. We found one example in paragraph 30 of somebody in Lawrence, South Carolina, that apparently was restricting prisons who could own firearms or if they hadn't taken the strong oath. But that seemed like a pretty thin example, and it was the only one that was there. The Vorenberg Declaration speaks only to the Reconstruction-era loyalty oaths. We've also cited some pre-founding loyalty oaths in our opening brief, and those are included in the Spitzer Declaration as well. And did they connect directly to firearms? Yes, they were enforcing underlying prohibitions on possessing arms and ammunition. And so someone who declined to take the loyalty oaths would have their arms and ammunition confiscated. And in many instances... The other side says it was a one-time, one-and-done type event. Compared to this, just every time you buy ammunition, what's your response to that? That's correct. It's one time that you have to take the oath. I do think the record also suggests that often the magistrate was required to keep a record in place of everyone who had taken the oath and who had not. And I think that's a very close historical precursor to a kind of database system where you have the option... And a whole range of citizen-oriented rights were allowed, and it was that there was no requirement to revisit it. Isn't that right? I think that is correct. But what I would stress is that Rahimi made clear that the analysis isn't just to find a dead ringer in the past for something that looks like a modern background check system. The question is whether or not there are principles under guiding that history that suggest that a background check or requirement would be constitutional today. So the loyalty oath is your best historical analog? I think it's... I don't think we have to show a best, and I think we've cited a number of other examples. 19th century carry licensing requirements come to mind where someone would have to come in and demonstrate that they satisfied a set of eligibility requirements before they would be permitted to carry firearms. And I think that the most important point is what these different historical examples are showing is that throughout history, governments have imposed screening mechanisms to decide whether or not people are disqualified from possessing firearms or ammunition. And I do think that the background check requirements are relevantly similar to that tradition. So if there are no further questions, I'll submit. We ask that you reverse the district court. Okay, we thank both sides for their argument. The case of Broad v. Bonta is submitted and we'll next hear argument in Davis v. Blue Tongue Films.
judges: BYBEE, IKUTA, BADE